*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

ANGELL CYARS-WILLIAMS,

        Plaintiff-Appellee,

v

THOMAS SKENDER and CITY OF DETROIT,

        Defendants-Appellants.

UNPUBLISHED
April 27, 2023

No. 359254
Wayne Circuit Court
LC No. 18-013365-NO

---

Before: M. J. KELLY, P.J., and SWARTZLE and FEENEY, JJ.

PER CURIAM.

In this action to recover noneconomic damages under the no-fault act, MCL 500.3101 *et seq.*, defendants Thomas Skender and the city of Detroit appeal as of right a judgment of $1,171,275.70 in favor of plaintiff, Angell Cyars-Williams, following a jury trial. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

On June 29, 2018, Skender, a police officer for the City of Detroit, received a call that an officer in the field required assistance at a secured scene. Skender, who was driving, did not turn on the vehicle's lights or siren. Further, because he and his partner had difficulty accessing their patrol vehicle's GPS, Skender attempted to manually enter their destination into his cellular telephone's GPS application. After a few minutes of attempting to navigate the GPS directions on his cellular telephone, Skender rear-ended Cyars-Williams' vehicle while she was stopped at a red light. A body-cam video of the incident clearly shows Skender's continued use of his cellular telephone in the minutes leading up to the rear-end collision. Additionally, over a defense objection, Cyars-Williams's husband, a retired police officer, was permitted to testify that the traffic crash report, commonly referred to as a UD-10, stated that Cyars-Williams was at fault for the crash. He claimed that as a result, their insurance premiums were increased and eventually cancelled. He further testified that he only got the UD-10 corrected by contacting "internal affairs."

Cyars-Williams asserted that, as a result of the collision, she was diagnosed with a concussion and sustained injuries to her knee and leg. At trial, she testified that after the crash, she suffered from near-constant headaches. She was also unable to efficiently engage in her work as a court reporter and could no longer assist her paraplegic father with his accounting business. She also struggled to be "present" and "hands-on" with her children. Similarly, her husband testified that Cyars-Williams's demeanor changed after the crash. She became extremely irritable, had frequent headaches, was listless, was unable to engage in family vacations, had difficulty sitting in a vehicle, was depressed, had crying spells, and developed a negative relationship with their children. Finally, one of Cyars-Williams's co-workers testified that before the crash, she was able to rely on Cyars-Williams to complete her work. Afterward, however, Cyars-Williams's work product became unreliable. She added that Cyars-Williams became more withdrawn, complained frequently about pain, and stopped engaging in her normal leisure activities.

Cyars-Williams also presented testimony from Dr. Suleiman Kojan, a neurologist, who testified that the day after the crash Cyars-Williams was diagnosed with concussion syndrome. He stated that a concussion is "practically" a traumatic brain injury. Approximately five months after the crash, he evaluated Cyars-Williams due to her complaints of impaired memory, slowed thinking, forgetfulness, frequent headaches, neck pain, and intermittent tingling in her left hand. Dr. Kojan administered a mental status examination, which showed that Cyars-Williams's cognitive functioning was in the borderline to normal range. Subsequent testing indicated that there was some decreased sensation in her left arm and face. Some of her symptoms improved while she was treating with Dr. Kojan. However, some of Cyars-Williams's reported symptoms persisted past the expected timeframe associated with her diagnosis, so Dr. Kogan referred Cyars-Williams to Dr. Destiny Peterson, a neuropsychologist, for more in depth testing.

Dr. Peterson testified that she administered a neuropsychology assessment. She determined that, although Cyars-Williams was not "significantly impaired," she fell below expectations in a few areas, including higher order attention and processing speed. In her written report, Dr. Peterson opined:

> The results of the current neuropsychological testing suggest primary evidence of mild-to-moderate impairments related to the immediate and delayed recall for verbally presented information, and impairments in balance and gross motor coordination. These finding occur in the context of overall average performance on assessment of attention, language, and executive functioning. This pattern of cognitive performance suggests likely continued impairments secondary to the injuries sustained during her motor vehicle accident. [Emphasis added.]

Dr. Peterson explained that the impairments were objectively manifested because they were based on standardized measurements "where we have a reference point of where a person should be following" and because each test was "administered in the same way." Dr. Peterson also performed symptom validity testing to assess whether Cyars-Williams was malingering. Based on that testing, Dr. Peterson opined that Cyars-Williams was not exaggerating, intentionally performing lower, or malingering. Dr. Peterson recommended that Cyars-Williams begin psychotherapy and behavior pain management. Thereafter, Cyars-Williams began treating with Dr. Peterson.

Defendants moved for a directed verdict under MCR 2.516. Relevant to the issues raised on appeal, they argued that Cyars-Williams failed to prove that she sustained a threshold impairment under MCL 500.3135. In particular, they argued that there was insufficient evidence that any impairment was affecting her general ability to lead her normal life because both before and after the accident she was able to work. And, although she presented evidence regarding the impact on her recreational activities and family life, the testimony was "very vague." Defendants also asserted that there was no objectively manifested impairment and that, even if there was an impairment, it was not serious. The court denied the motion.

Thereafter, defendants presented testimony from the emergency medical technician (EMT) that responded to the crash. The EMT testified that Cyars-Williams's vitals were stable and that she scored a 15 on the Glasgow Coma Scale, which was used to measure her alertness and mental status. He offered to transport Cyars-Williams to the hospital, but she declined. Instead, she transported herself to Sinai-Grace Hospital with complaints of head pain and, because she continued to feel unwell the next day, she drove herself to Beaumont Hospital. And, as indicated above, she was diagnosed with concussion syndrome, received treatment for her concussion from Dr. Kojan, and was referred to Dr. Peterson for additional neurological testing.

Following the presentation of defendants' proofs, the jury found that defendants were negligent, that Skender was grossly negligent, and that their actions were a proximate cause of Cyars-Williams' injuries. Further, the jury found that Cyars-Williams' injuries resulted in a serious impairment of a bodily function that affects her ability to lead a normal life. The jury awarded $750,000 in damages for pain and suffering and $250,000 in damages for future pain and suffering. Defendants moved for judgment notwithstanding the verdict or a new trial under MCR 2.610 and MCR 2.611, arguing errors of law had denied them the right to a fair trial. The trial court denied defendants' motion and entered a final judgment in favor of Cyars-Williams. This appeal follows.

## II. INADMISSIBLE EVIDENCE

### A. STANDARD OF REVIEW

Defendants first argue that the trial court abused its discretion by permitting Cyars-Williams's husband to testify regarding the contents of the UD-10 report prepared in connection with the collision. They argue that the UD-10 was inadmissible under MCL 257.624(1). Further, they assert that Cyars-Williams's testimony regarding what the report said was inadmissible hearsay, was irrelevant, and—even if it were relevant—the testimony should have been excluded under MRE 403's balancing test because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. "The admission of evidence is reviewed for an abuse of discretion." *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016). "A trial court abuses its discretion when its decision falls outside the range of principled and reasonable outcomes." *Crego v Edward W Sparrow Hosp Ass'n*, 327 Mich App 525, 531; 937 NW2d 380 (2019).

## B. ANALYSIS

MCL 257.624(1) provides that a UD-10 report "shall not be available for use in a court action[.]" Thus, the UD-10 itself is "not admissible in evidence." *Germiquet v Hubbard*, 327 Mich 225, 233; 41 NW2d 531 (1950). In this case, Cyars-Williams's husband testified that the UD-10 indicated that Cyars-Williams was at fault for the crash, but no physical copy of the report was admitted. The absence of the physical version of the UD-10 is not dispositive, however. As explained by the Court in *Germiquet*, it is impermissible for a witness to read the substance of a UD-10 report to the jury because such testimony actually results "in placing a part of the report in evidence before the jury." *Id.* Indeed, the *Germiquet* Court stressed that the "obvious purpose of the legislature is defeated" if "the report, or any part of it, can be put in evidence by reading it to the jury." *Id.* Here, although Cyars-Williams's husband did not read from the report, he testified as to the substance of the report, thereby placing part of the report before the jury in violation of MCL 257.624. By permitting the admission of evidence that is inadmissible as a matter of law, the trial court necessarily abused its discretion. See *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004) ("A court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law.") (quotation marks and citation omitted).[1]

Reversal is not required, however, because the admission of the evidence was harmless error. This Court will not modify a decision of the trial court on the basis of a harmless error. MCR 2.613(A). An error is harmless if it was not decisive to the outcome of the case. *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017). In this case, the improperly admitted testimony resulted in the jury learning that an unidentified police officer—who had not witnessed the crash—had assigned fault for the crash to Cyars-Williams. Moreover, Cyars-Williams's husband testified that because of the assignment of fault, their insurance premiums were raised and their policy was eventually cancelled. He also testified regarding his efforts with "internal affairs" to set it right. Finally, during closing argument, Cyars-Williams's lawyer highlighted the UD-10, asking the jury to consider that the police report was an attempt by the police department to "c.y.a." Although the words "cover up" were not expressly used, CYA is an acronym for "cover your ass." Accordingly, it is clear that Cyars-Williams was asking the jury to consider the fact that the UD-10 report assigned fault to her so that the police department could cover-up Skender's fault in causing the crash.

On appeal, defendants have not shown that the impact of the improper testimony affected the outcome of the trial. Defendants suggest that the jury was inflamed by the improper admission of the UD-10 report and the implication of a cover-up. However, we cannot ignore the fact the video of the crash was played to the jury. That footage showed Skender driving while

---

[1] Because admission of the testimony was improper under MCL 257.624, we do not address defendants' additional arguments regarding the admissibility of Cyars-Williams's husband's testimony regarding the substance of the UD-10 report. However, we note that the UD-10 was prepared by an officer who was not present at the time of the collision, nor does the record reflect that the officer is a qualified accident reconstructionist. As a result, the officer's opinion that Cyars-Williams was at fault for the collision was not admissible under MRE 701. See *Miller v Hensley*, 244 Mich App 528, 531; 624 NW2d 582 (2001).

simultaneously typing searches into his cellular telephone before eventually striking the rear of the Cyars-Williams's vehicle while it was legally stopped at a red light. In the video, Skender can clearly be heard cursing and saying that he "rear-ended" Cyars-Williams. He also made multiple statements acknowledging his fault in causing the crash, including that he "bumped into her," that he did not hit her vehicle hard, that the crash was "my bad" because he had been using the GPS on his cellular telephone, that he "tapped her bumper," and that "obviously, [the crash] was my fault." Skender also indicated that he believed Cyars-Williams was pretending to be injured. He stated that Cyars-Williams had said "her head hurts" but had also told them that EMS did not need to be called. Skender told other officers at the scene that he had "called medics here for cya." Later, he repeated that "we did it for cya." As a whole, notwithstanding that the body-cam video depicts a plain violation of the law, defendants never conceded negligence and argued against it to the very end. Had they conceded negligence and the UD-10 came in as described above, it would be easier to conclude that the report played a role in the jury's verdict. But the implication from defendants' argument is that the jury rendered a verdict finding negligence and gross negligence as well as a far higher-than-reasonable damages award because they were inflamed by the admission of the UD-10 report assigning fault to Cyars-Williams. Yet it is just as easy to conclude that, if the jury was inflamed at all, it was because they were incensed—outraged even—at defendants' refusal to accept responsibility for the collision. This was true irrespective of any mention of the UD-10. Accordingly, we cannot accept the argument that the improper admitting of the UD-10 requires the reversal of the verdict.

## III. DIRECTED VERDICT

## A. STANDARD OF REVIEW

Defendants also argue that the trial court erred by denying their motion for a directed verdict because Cyars-Williams's alleged injuries do not meet the threshold for a third-party claim under MCL 500.3135. "This Court reviews de novo a trial court's grant or denial of a directed verdict. In doing so, we view the evidence in the light most favorable to the nonmoving party." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 491; 668 NW2d 402 (2003) (citations omitted).

## B. ANALYSIS

"A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). Whether a person has suffered a serious impairment of body function is a matter of law for the court to decide if the court finds:

> (*i*) There is no factual dispute concerning the nature and extent of the person's injuries.

> (*ii*) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement. However, for a closed-head injury, a question of fact for the jury is

created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury. [MCL 500.3135(2)(a).]

Defendants first argue that the closed-injury exception, which is stated in the last sentence in MCL 500.3135(2)(a)(*ii*), does not apply because Dr. Peterson is not a qualified physician and because Dr. Kojan did not testify that Cyars-Williams may have a serious neurological injury. We agree. Dr. Peterson is not a licensed allopathic or osteopathic physician, so her testimony cannot satisfy the closed-head exception stated in MCL 500.3135(2)(a)(*ii*). Moreover, Dr. Kojan's testimony did not establish Cyars-Williams had a serious neurological injury. Instead, he stated that she had borderline to normal neurological examinations. Thus, his testimony is also insufficient to meet the closed-head exception.

Cyars-Williams's failure to satisfy the requirements of MCL 500.3135(2)(a)(*ii*), however, is not the end of the inquiry. Instead, as explained by this Court in *Churchman v Rickerson*, 240 Mich App 223, 232; 611 NW2d 333 (2000), in cases where a plaintiff cannot satisfy the closed-head exception in MCL 500.3135(2)(*ii*), a plaintiff may nevertheless "establish a factual question under the broader language set forth in subsection 3135(2)(a)(*i*) and (*ii*), which, as noted above, provide that whether an injured person has suffered serious impairment of a body function is a question for the court unless the court finds that '[t]here is no factual dispute concerning the nature and extent of the person's injuries,' or, if the court finds that there is such a factual dispute, that 'dispute is not material to the determination as to whether the person has suffered a serious impairment of body function . . . .' "

MCL 500.3135(5) defines a "serious impairment of a body function," stating:

As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:

(a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.

(b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.

(c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

On appeal, defendants suggest that Cyars-Williams only suffered a minor injury and her condition was improving, she was not seriously impaired. They point out that Cyars-Williams did not treat with Dr. Kogan until five months after the crash, and she did not see Dr. Peterson until over a year and a half after the crash. Dr. Kogan testified that a minor injury would be expected

from a low-speed crash, and Dr. Peterson referred to Cyars-Williams's injury as a "mild traumatic brain injury." Testing performed by Dr. Kogan showed that the neurological examination of Cyars-Williams showed she was normal to borderline, and Dr. Peterson stated that Cyars-Williams was not "significantly impaired." Both doctors also described that Cyars-Williams had shown improvement as a result of treatment. Defendants suggest, therefore, that Cyars-Williams is unable to meet the statutory threshold because she did not immediately receive treatment from Dr. Kogan and Dr. Peterson, they did not describe the injury as "serious," and Cyars-Williams was improving.

Defendants' argument, however, incorrectly focused on the *extent* of Cyars-Williams's injury. MCL 500.3135(5)(a), which defines what constitutes a "serious impairment of body function," does not require Cyars-Williams's doctors to *diagnose* her with a serious or significant brain injury, rather, she is only required to prove that any impairment is observable or perceivable from actual symptoms or conditions. See *id*. An "objectively manifested impairment" is an impairment "observable or perceivable from actual symptoms or conditions." *McCormick v Carrier*, 487 Mich 180, 196; 795 NW2d 517 (2010).[2] "[W]hen considering an 'impairment,' the focus is not on the injuries themselves, but how the injuries affected a particular body function." *Id*. at 197 (quotations marks and citation omitted). "[P]laintiffs must introduce evidence establishing that there is a physical basis for their subjective complaints of pain and suffering and that showing an impairment generally requires medical testimony." *Id*. at 198 (quotation marks and citation omitted). Here, Dr. Kojan testified that, although the majority of Cyars-Williams's examination results were normal, she was diagnosed with concussion syndrome and showed decreased sensation in her left arm and the left side of her face. In turn, Dr. Peterson testified, based on objective testing measures, Cyars-Williams's cognitive functioning fell below her expected level of functioning, specifically in terms of her memory, attention, sequencing, problem solving, balance, and gross motor coordination. Consequently, even though Cyars-Williams was not significantly impaired based on her examination results, Cyars-Williams's doctors were able to objectively observe and measure her reported neurological symptoms and conditions. As a result, Cyars-Williams showed that there was a material question of fact as to whether she satisfied the requirement in MCL 500.3135(5)(a).

Next, the brain is undeniably an important body function for any plaintiff. See *Allen v Bloomfield Hills Sch Dist*, 281 Mich App 49, 57; 760 NW2d 811 (2008) ("Although the brain is the organ responsible for our thoughts and emotions, it is also the organ that controls all our physical functions."). Here, Cyars-Williams suffered an injury to her brain that resulted in headaches, cognitive issues, and motor functioning problems. Because her impairments are related to the function of her brain, she has created, at the very least, a question of material fact whether she reasonably met MCL 500.3135(5)(b).

Finally, Cyars-Williams also showed that there was a material question of fact as to whether the impairment affected her general ability to lead her normal life. Our Supreme Court has explained that MCL 500.3135(5)(c) "merely requires that a person's general ability to lead his

---

[2] At the time *McCormick* was decided, MCL 500.3135(5) was codified as MCL 500.3135(7). As a result of legislative amendments in 2012, see 2012 PA 158, MCL 500.3135(7) was renumbered to MCL 500.3135(5), but the substance of the statutory text remained the same.

or her normal life has been *affected*, not destroyed." *McCormick*, 487 Mich at 202-203. "Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id*. at 203.

Cyars-Williams's husband testified that, after the accident, Cyars-Williams experienced regular headaches, was irritable, tired, listless, and struggled to sit in cars for long periods of time during their family's regular road trips. Cyars-Williams friend and coworker testified, after the crash, Cyars-Williams's work suffered because she significantly slowed in her production and was often late in submitting her work. She also stated Cyars-Williams often complained of headaches and withdrew from recreational activities they used to frequently do together. Further, Cyars-Williams testified that she could no longer assist her paraplegic father with his business or be a hands-on mother for her children because of the constant pain from her headaches. Dr. Peterson stated Cyars-Williams struggled with higher order cognitive functions and gross motor coordination. Dr. Peterson also testified that Cyars-Williams reported struggling with work, her family, and having the physical energy to engage in her day-to-day life. Dr. Peterson added that Cyars-Williams is not 100% back to her level of functioning that she was at before the crash. This testimony is sufficient to show that Cyars-Williams's general ability to lead her normal life has been affected.

In sum, evaluating the evidence in the light most favorable to Cyars-Williams, the evidence presented has sufficiently created a question of fact whether all three prongs of MCL 500.3135(5), which defines the phrase "serious impairment of a body function," have been satisfied. Consequently, the trial court did not err in denying defendants' motion for a directed verdict. The matter was properly submitted to the jury.

Affirmed. Cyars-Williams, as the prevailing party, may tax costs. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Brock A. Swartzle
/s/ Kathleen A. Feeney